# Deposition Transcript

Case Number: 1:24-cv-02498-ABA
Date: May 18, 2026

In the matter of:

# SABRINA TAPP-HARPER v SHERIFF SAMUEL COGEN

# Samuel Cogen

CERTIFIED COPY

Reported by:
Ahuva Goldberger

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

EXHIBIT
tabbies
2

Q. Anybody else given notice on November 30, 2022?
A. Yes.
Q. Who?
A. Governor Tillery, who was a captain. Ms. Ware, who was the executive assistant of the -- the sheriff at the time, John Anderson. Well, actually the -- the previous sheriff, John Anderson, and then Sabrina Tapp-Harper.
Q. Okay. And --
A. And Jason Gruzs, who you just said.
Q. And I think we already established that Therman Reed gave either Jason Gruzs and/or Henry Martin the notice that came from you?
A. I know he gave -- I don't know if he gave anything to Henry Martin.
Q. Whoever was in the -- in the chief deputy position?
A. Correct.
Q. Therman Reed relayed the notice coming from you that they had been relieved of their responsibilities?
A. So Therman Reed, I believe -- or Joseph Whitaker relayed the information to Gruzs that he was no longer in the -- whether or not he was in

back?
A. Correct.
Q. Okay.
A. Yes, he was not an employee of the sheriff's office.
Q. Got you.
We talked a bit about the transition conversations that Lenora Dawson was kind of point of contact, right?
A. At the office.
Q. At the office?
A. Correct.
Q. Was anybody else inside the sheriff's office administration prior to your being sworn that briefed you on matters -- let's say, human resource matters?
A. No.
Q. No one.
Was anybody on your team that received briefings -- administrative briefings or otherwise prior to you being sworn?
A. No.
Q. Did you get any information back -- did Therman Reed come back to you on the 30th with any information that was related to the directive you

gave to remove the names that you mentioned from those various positions?
A. Yes.
Q. All right. What was that information he brought back?
A. He came back with a piece of paper, which was a -- a settlement agreement contract that Sabrina Tapp-Harper had provided him, and made sure that I had it, and said that he wants to make sure -- she wanted to make sure that before she was sent home, that I had a copy of this.
Q. Okay. And had you been made aware of the contents of the letter prior to receiving it?
A. No.
Q. What was -- what was in the letter?
A. It was a settlement agreement where she, Sabrina Tapp-Harper, was promoted to assistant sheriff and then signed by the sheriff of Baltimore City.
Q. Did you understand that to be an official document?
A. I did.
Q. What was the effective date in the official document that you reviewed?
A. I -- I don't recall.

Chief Deputy Whitaker.
Q. All right. So Chief Deputy Whitaker -- what role was he in prior to you being sworn?
A. So him and I had spent like 25 years working together at the sheriff's office, and both him and I were retired from the sheriff's office at that time.
Q. So he wasn't in the office?
A. No.
Q. But he called you about a promotion?
A. Correct.
Q. And you don't recall when he called you?
A. I would assume it was on or about when it -- it was made public, so either that day probably or the day after.
Q. When you say it was made public, what do you mean?
A. Usually, they put an announcement out at the sheriff's office.
Q. They put an announcement out at the sheriff's office?
A. Correct.
Q. So it would be an internal notification?
A. Correct. But someone would've probably called chief deputy, "Hey", right? And then he

Q. Your immediate supervisor, Chief Deputy Martin, did not direct you to go call the law office -- Baltimore Police Department, correct?
A. He told me -- yes, he did. He told me to look -- well, no, he told me to look into it.
Q. Told you to look into it?
A. Correct.
Q. He didn't tell you what that meant, right?
A. He did not.
Q. So you looked into it.
A. I did.
Q. You shared with him what you looked into?
A. Correct. I -- and -- and my opinion on it.
Q. And your opinion on it?
A. Yeah, which was this is not a road we should go down. It's not going to be successful and we should not go forward with this.
Q. But that information is not shared by him in this meeting, right?
A. That's correct.
Q. And it's not shared by you in this meeting, correct?

had filed an EEO complaint because Therman Reed handed me a piece of paper that said that she had filed an EEO complaint, which is the settlement -- which is Plaintiff's Exhibit 1. But I didn't know anything about, you know, Wilkerson or any of that kind of stuff until way, way, way later.

Q. So Therman Reed gives you the notification document back and the settlement agreement that references resolution of an EEO complaint?

A. Correct.

Q. So you know there's an EEO complaint?

A. That's correct.

Q. You don't inquire as to what the EEO complaint is in reference to?

A. Well, I figured it was something that -- that those guys did, right, the chief deputy and the sheriff and whatnot, when I was out. That's what I figured it was.

Q. How did you figure that?

A. Because I didn't think that I would have done anything that would have been EEO actionable.

Q. Did you do anything to verify what the EEO complaint was actually about?

A. No.

Q. You didn't. You just know there's one?

A. I know there's one, right, and then I said, hey, there's the settlement from an EEO complaint that I guess, presumed was the sheriff and the chief deputy doing whatever they did, right, because just the timeframes of it. And then I didn't know that I was even mentioned in this thing until way, way later.

Q. Did you follow up with anybody in HR? You're getting ready to make a personnel move, right, in December?

A. Yes.

Q. Right? You have a settlement agreement?

A. Yes.

Q. It's in response to an EEO complaint?

A. Correct.

Q. Who was responsible for EEO complaints at the time?

A. Tyra Stewart.

Q. Did you have a conversation with Tyra Stewart?

A. No.

Q. You didn't ask, hey, do you know anything about this?

A. I didn't say, hey, print out the EEO

were advised to just -- you know, stay at home and answer your phones, basically, that's what the addendum is, right?

If we call you during working hours we would like you to answer. We duped their position numbers and we requested legal advice whether or not we could continue forward with not reappointing, which will be the termination. If there's anything that stopped us from that.

And this Exhibit P-1 was sent along with the suspension forms, I believe, to the Attorney General's office, to review as documents that occurred on day one. Day one of my -- day of office.

Q. Okay. So the letter and the suspension form were sent to the AG's office as part of the process of getting legal advice?

A. Getting legal advice on whether or not there was anything that prevented us -- or prevented me from following through with the termination.

Q. All right.

A. But that was going to happen anyway before I knew that there was -- this letter even existed.

Q. Did you share it with Sheriff Anderson?
A. I did not.
Q. Sheriff Anderson appointed you to be the assistant sheriff, correct?
A. He -- he did.
Q. You didn't feel it was necessary or appropriate to advise the sheriff of information that you had about this practice?
MS. GBEMUDU: Objection. Characterization.
You can go ahead and answer.
THE WITNESS: I felt like it was appropriate at this point to resign from the sheriff's office and run against him, to run the office in a way that things like that didn't happen anymore.
BY MR. YEARY:
Q. And so with that in mind, you still didn't think it was appropriate to tell the sheriff, since you mentioned as a citizen earlier, there are certain concerns that you would have, and so you've spoken to media to get political leverage, and so rather than putting the sheriff on notice, you resigned to run for political office?

of the office to the federal office and initiating that with the federal government. And they do the investigation and -- and provide the findings.

Q. Okay. And when you were sworn in, on the date in which you were sworn in, November 30th of 2021, were you aware of any pending internal EEO complaints with the Baltimore City Sheriff's Office?

A. I was not.

Q. Okay. Were you aware of any federal EEO complaints filed with the Baltimore City Sheriff's Office?

A. I was not.

Q. Okay. Can you explain broadly what the chain of command means to someone who is a layperson, who knows nothing about law enforcement, what does that mean?

A. Sure. So it's a system where you have a subordinate employee who reports to someone else, and it's -- it's from the military structure. So, like, it would start with the deputy sheriff, who then reports to a sergeant, and usually you have a span of control which is you would have ten deputy sheriffs reporting to one sergeant, and that sergeant would be running like a squad, doing a

it through negligence, you would have to write a check to the Department of Finance and submit that. But other than that, there was no real -- real -- there was no reimbursement for training process. Just didn't exist because it didn't happen.

Q. And in your position as assistant sheriff, would you have controlled any of those reimbursement situations?

A. No. No, those all went -- like, that was an HR function, if it was anything. Like, so when you lost -- and the reason I say it's an HR function, because we don't control our finances, the city does, and so when you reimburse the city, it has to go through the payroll system, which is -- which is a check to the director of finance, and so it would have gone to the HR and the payroll section, and they would have remitted that money back into the thing to get it back into the budget.

Q. Okay. So I'm correct in saying that any reimbursements that would have come from Alexis Wilkerson or any other employee with the Baltimore City Sheriff's Office, that money would have gone to the city first?

A. Correct, yes.

Q. And then the city would have been responsible for somehow getting that back to the Baltimore City Sheriff's Office?

A. Correct.

Q. Okay. And correct me if I'm wrong, you had -- you played no role, administratively, within that process?

A. Correct.

Q. Okay. When an employee separates from the Baltimore City Sheriff's Office, do you know who triggers the reimbursement process if it's triggered at all?

A. Yeah. I -- I mean, we don't do that, and I think this is the first time this ever came up, ever. And it just -- like it -- again, I got to go back, this, like, never was going to happen because it just wasn't legally sufficient. And I think, you know, the premise behind it, if I had to guess, was to like make people want to stay because they were worried about they had to pay this thing back. But it was unenforceable, so --

Q. And regarding Alexis Wilkerson specifically, how did you become aware that she separated from the Baltimore City Sheriff's

person I spoke to.
Q. And so any decisions that you would have made on day one, would be between yourself and then Chief -- Chief Deputy Whitaker?
A. Right. And we included Lenora Dawson in some of those conversations, but not all of them.
Q. And how far back would you say before November 30th of 2021, did those conversations start happening?
A. Like, pretty much right after the primary election; we won that.
Q. Okay.
A. Because now we're like, hey, this is real, we're going forward and we got to set things up, let's start talking about how we want to structure this.
Q. And prior to your swearing in on November 30th of 2022, did you receive any sort of transition documents from then Sheriff Anderson and anyone within his administration?
A. Other than we're not having a transition with you, right?
Q. Okay. And so no one from his command staff provided you with any sort of memos or documentation regarding a transition?

A. Correct.
Q. At what point did you specifically decide to suspend five employees that you named earlier in your deposition?
A. Yeah, so prior to us coming in, I don't know when exactly it was, but it was -- like, we knew we were going to do that when we arrived that day.
Q. But it wasn't on November 30th that you decided --
A. No, it was prior to that.
Q. Okay.
A. Yeah. And the replacements were all there.
Q. And when you say the replacements were all there, do you mean on November 30th of 2022 --
A. Yeah.
Q. -- the five employees, or the employees that you decided to suspend, all had replacements that were coming in under your administration?
A. Correct.
Q. Okay.
A. Except for one who was still employed and had given notice.
Q. Okay. And given notice of what?

were aware of was deciding to retire from their position?

A. Correct.

Q. Okay. There was also some -- some testimony and some questioning about when you became aware of Ms. Tapp-Harper's internal EEO complaint versus when you became aware of the substance which is, you know, your name being a part of it.

On November 30th of 2022, when you suspended Ms. Tapp-Harper, did you have any information or knowledge regarding the substance of her EEO complaint?

A. No.

Q. And am I correct in that you did not learn of that -- the substance of Ms. Tapp-Harper's EEO complaint until August of 2023, which was stated in your interrogatories?

A. Yes.

Q. Sheriff Cogen, just a few more questions for you and then -- there was some -- some testimony or some questioning regarding a September 2nd of 2020 -- let's see, 2022 e-mail that you sent to then Sheriff Anderson. Are you aware of that?

A. Yes.
Q. Okay. And part of the ask or part of your request were pauses to certain administrative matters, correct?
A. Correct.
Q. Are you aware of any of those pauses or any of those requests being met by Sheriff Anderson?
A. They weren't met.
Q. Sheriff Cogen, just to -- just to finish out, and I want to just make sure that this point is clear, when you suspended Ms. Tapp-Harper and then subsequently terminated her from your position -- from her position as assistant sheriff, were you aware of the contents of her internal EEO complaint?
A. I was not.
Q. And did -- when you suspended Ms. Tapp-Harper on November 30th of 2021 and ultimately terminated her on December 27th of 20 -- sorry, 2022 -- I keep getting those years messed up -- but when she was ultimately terminated, did you -- or what was the basis of her termination?
A. That I didn't want to reappoint her. I

wanted to bring my own staff in.

Q. And were you aware of individuals who had been elected into elected positions bringing their own staff in?

A. Yes.

MS. GBEMUDU: No further questions.

MR. YEARY: Just a few in follow up to counsel.

THE VIDEOGRAPHER: Off the record at 4:11.

(A short break was taken.)

THE VIDEOGRAPHER: We are now on the record. The time is 4:15.

EXAMINATION

BY MR. YEARY:

Q. Sheriff Cogen, just a few follow-up questions to counsel's questions. And again, thank you for -- for making yourself available for the time here.

Just a couple of things on the -- on the front end, counsel, just in case since we do have records and communications that we need to follow up on, for those purposes I just want to kind of hold open until we get those to find out if there are any follow-up questions and then we can -- we