IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SABRINA TAPP-HARPER, Plaintiff, | ) | CASE NO. 1:24-CV-002498 |
| - vs - | ) | |
| SHERIFF SAMUEL COGEN, Defendant. | ) | |

- - - - - - - - - - - - - - -

Video Deposition of SABRINA TAPP-HARPER was taken on Wednesday, May 13th, 2026, commencing at 10:37 a.m., at the LAW OFFICES OF THE ATTORNEY GENERAL - COURTS DIVISION, 200 St. Paul Place, 20th Floor, Baltimore, Maryland, before ADINA BERMAN, Notary Public.

REPORTED BY: Adina Berman, RPR

EXHIBIT 4

exhibitsticker.com

then Sheriff Anderson signed on August 18th of 2022; is that correct?

**A. Yes.**

Q. And was Sheriff Cogen at all involved in the negotiations of this settlement agreement?

**A. I'm not sure about that.**

Q. And when you say you're not sure about that, do you know if Sheriff Cogen was working for the office at the time in which the settlement agreement was executed in August of 2022?

**A. He was not.**

Q. Okay. And because Sheriff Cogen was not employed by the Sheriff's Office in August of 2022, was he at any point a party to this agreement that was signed and executed in August of 2022?

**A. I don't know about that.**

Q. Okay. And I guess from your recollection and your knowledge of signing this document and executing it with then Sheriff Anderson, did Sheriff Cogen ever sign this document?

**A. Not that I'm aware of.**

Q. Or the document that you have in front of you.

**A. No.**

Q. Did Sheriff Cogen ever sign that?

**A. No.**

Q. To your knowledge, was Sheriff Cogen ever aware of these settlement agreement or this settlement agreement?

**A. Yes.**

Q. Okay. And when did he become aware to your knowledge?

**A. When Therman Reed gave me suspension paperwork, I provided him with a copy of the settlement agreement and that would have been on 11/30/22. And I had a subsequent conversation with then Assistant Sheriff Reed, yes, and I asked him. He told me that he did provide Sheriff Cogen with a copy.**

Q. So before November 30th of 2022, do you know if Sheriff Cogen took part in any of the settlement negotiations of your promotion to

assistant sheriff?

**A. I don't know about that.**

Q. And in exchange for withdrawing your original complaint filed on September 7th and the addendum filed on September 29th of 2021, you were promoted to assistant sheriff, correct?

**A. Yes.**

Q. So then fast forward to November 30th of 2022, that was the day that Sheriff Cogen was sworn into the position of sheriff. At that time, your internal EEO complaint had been settled at that time, correct?

**A. Yes.**

Q. And am I correct in that at that time you had no pending EEO complaints with the Baltimore City Sheriff's Office?

**A. I did not.**

Q. After you signed your settlement agreement on August 17th of 2022, did you file any new internal EEO complaints with the Baltimore City Sheriff's Office?

City Sheriff's Office ever communicate to you that they had notified then Assistant Sheriff Cogen that he had been named in your original internal complaint and then your addendum?

**A. No.**

Q. Did you ever have any direct conversation with then Assistant Sheriff Cogen about your EEO complaint or the allegations you made against him?

**A. No.**

Q. To your knowledge, what happened within the Sheriff's Office as a result of you naming Sheriff Cogen within your complaint?

**A. Within the office?**

Q. Yes.

**A. I'm not sure if anything happened in the office, but days after I filed the addendum, Sheriff Cogen retired. Then Assistant Sheriff.**

Q. And in your -- as part of your addendum, and I'll direct your focus to that, to Exhibit Number 3, do you have any knowledge or information as to why Sheriff Cogen resigned from the Sheriff's

Office at that time?

**A. No.**

Q. As part of your addendum, I'm going to direct your attention to paragraph number two of the addendum. Are you there?

**A. Yes.**

Q. Okay. And I'll say -- let's see; four lines from the bottom of that paragraph. I'll read aloud. It says, he went on to say, this was his last year working with the Sheriff's Office and he planned to retire next May. Am I correct in that the conversation you had after the command staff meeting on September 27th of 2021 Sheriff Cogen relayed to you he had planned on retiring from the Baltimore City Sheriff's Office?

**A. The following year.**

Q. Yes, but he relayed to you that he had planned on retiring from the Sheriff's Office?

**A. Yes; the following year, but not days later.**

Q. But again, to answer my question, he

**A. I would say within a couple of months.**

Q. So within a couple of months of Sheriff Cogen resigning from the Sheriff's Office, he called you to state his intention to run for sheriff of Baltimore City?

**A. Yes. And asked me to meet with him.**

Q. Did that meeting ever take place?

**A. No.**

Q. And do you know what the meeting was about?

**A. No.**

Q. I'm going to turn your attention back to your amended complaint on tab six or Exhibit 6, paragraph 22. Let me know when you're there.

**A. I'm there.**

Q. Is it your idea or -- sorry. Let me rephrase that. To your knowledge, do you know what the reason for Sheriff Cogen's resignation was days after your filing of an addendum?

**A. No.**

Q. And so Sheriff Cogen resigned in 2021 so

days after the filing of your addendum on September 29th of 2021. So at the time in which you were made assistant sheriff on September 1st of 2022, Sheriff Cogen was not a part of the office at that time?

**A. No.**

Q. From the time Sheriff Cogen resigned from the Sheriff's Office until he was sworn in on November 30th of 2022, he was considered to be a private citizen, correct?

**A. I think actually he may have been sheriff-elect.**

Q. Okay. So he would have become sheriff-elect once he won the primary election?

**A. I'm not sure about that or if the general had to happen.**

Q. Absolutely. So during the primary election, Sheriff Cogen had won against then Sheriff Anderson. Was that correct?

**A. Yes.**

Q. And there was no Republican challenger at the time?

Q. Ms. Tapp-Harper, do you have any evidence that anyone from the Sheriff's Office informed Sheriff Cogen of your internal EEO complaint prior to his swearing in on November 30th of 2022?

**A. No.**

Q. And you never personally told Sheriff Cogen about your internal complaint with the Baltimore City Sheriff's Office before the swearing in on November 30th?

**A. No.**

Q. And outside of the phone conversation that you had with Sheriff Cogen a few months after his resignation from the Sheriff's Office, did you have any other personal conversations with him prior to his swearing in on November 30th?

**A. No.**

Q. And you never personally told Sheriff Cogen about your initial internal complaint or your addendum filed within the Baltimore City Sheriff's Office prior to his swearing in on November 30th?

**A. No.**

Q. Do you know of any witnesses who have told you directly or indirectly that Sheriff Cogen knew about the internal EEO complaint that you made naming him before he took office?

**A. No.**

Q. And are there any documents such as e-mails, memos, reports, or any written communications that you have access to that you believe demonstrate Sheriff Cogen's awareness of your internal complaint prior to his swearing in on November 30th?

**A. Not that I'm aware of, no.**

Q. Did anyone from the HR department who was handling your internal EEO complaint ever tell you that Sheriff Cogen had been formally notified of your complaint?

**A. No.**

Q. Had anyone ever told you or from the HR department of the Baltimore City Sheriff's Office ever told you that Sheriff Cogen had been notified of the resolution of that complaint?

**A. No.**

Q. Ms. Tapp-Harper, I'm going to turn your attention to tab five or Exhibit 5, which is a copy of the settlement agreement that you signed on August 17th of 2021. Let me know when you have that in front of you.

**A. Which tab did you say?**

Q. Tab five.

**A. Okay.**

Q. Okay. Earlier you identified Therman Reed as a witness to, you know, Sheriff Cogen's knowledge about the existence of this settlement agreement. Can you tell me everything that you know or that you discussed with Therman Reed regarding this settlement complaint and Sheriff Cogen's knowledge of that?

**A. Yes. So Therman Reed was the person who suspended my police powers and provided me -- he signed this document dated 11/30/22. And Reed told me at that time, I gave him a copy and he told me at that time that it was Cogen's intention to fire me.**

**And a month later, on December 27th to be exact, I got the termination letter.**

Q. And outside of that conversation with Therman Reed on November 30th of -- just want to make sure I'm getting my dates correct -- of 2022, did you have any additional conversations with him regarding your settlement agreement and him providing it to Sheriff Cogen?

**A. Yes. I gave him a copy of the settlement agreement, which he told me he gave to Sheriff Cogen, and when Sheriff Cogen brought the termination information to his attention, he told him not to do it.**

Q. And when did that conversation happen?

**A. Sometime between 11/30/22 and 12/27/22.**

Q. And the conversation that you had with Therman Reed regarding the fact that he stated he had given Sheriff Cogen a copy of your settlement agreement and that Sheriff Cogen's intention was to terminate you, did that conversation happen on November 30th or at some later date?

understanding that this article was in any way connected to your promotion or this e-mail.

**A. When you say connected, what do you mean because he references my promotion -- he references the promotional process to stop. I'm the only person who was promoted the day before that.**

Q. And in this e-mail, does he mention you by name?

**A. No, but he doesn't mention anybody being hired, no new hires or anybody else by name. But even though he doesn't mention me by name, I'm the only person who was promoted the day before that.**

Q. Am I correct in that this e-mail had no bearing on your promotion because you had been promoted the day before; is that correct?

**A. No, it didn't.**

Q. When you say, no, it didn't --

**A. No, it didn't have any bearing on that promotion, no.**

Q. Okay.

**A. But if there was an intention to promote**

pauses that were asked for by Sheriff Cogen went into effect?

**A. I know there were no additional promotions.**

Q. But again, you don't know if there were any in the process at that time?

**A. I don't.**

Q. And so am I correct in saying that this specific communication, this specific e-mail had no impact on your promotion to assistant sheriff on September 1st of 2022?

**A. No, it didn't.**

Q. And you continued to serve as assistant sheriff from September 1st of 2022 through or to November 30th of 2022, correct?

**A. I did.**

Q. And that service was for almost about three months without interruption, correct?

**A. Yes.**

Q. As assistant sheriff, your position is termed to be at will?

your position for things and not be terminated as an at-will employee.

**A. I'm still not completely clear on what you're asking.**

Q. I can rephrase the question for you.

**A. Okay.**

Q. In your settlement agreement, was there anything guaranteeing your employment for a term or any sort of period of time?

**A. So the promotion specifically talks about me agreeing to voluntarily dismiss the claims that had been in place and it does not give a specific time but it also does not indicate that I could inadvertently be terminated from my position.**

Q. When you say inadvertently, what does that mean? Can you describe that?

**A. Without cause.**

Q. So just to answer my question, there is no specific term or period of time in which you would be an employee for -- in the employ or in the position of assistant sheriff within this settlement

Q. Pointing your attention to -- let's see. Exhibit 13 under tab 13, which is a copy of the suspension notice that you received on November 30th of 2022. Do you have that in front of you?

**A. I do.**

Q. Did Sheriff Cogen ever say to you directly or indirectly anything suggesting that the suspension was related to your EEO complaint?

**A. No.**

Q. Has anyone ever told you that Sheriff Cogen made any sort of statement indicating that your EEO complaint was a factor in his decision to suspend you?

**A. No.**

Q. Did anyone ever tell you that Sheriff Cogen made any statement indicating that your EEO complaint factored into his decision to ultimately terminate you?

**A. No.**

Q. Do you have any e-mails, text messages, or other documents in which Sheriff Cogen references

your EEO complaint in connection with his decision to suspend or terminate you?

**A. No.**

Q. Do you have any documents reflecting any sort of retaliatory motivation from Sheriff Cogen in his reasoning to suspend or terminate you?

**A. I believe that the news articles and the --**

Q. I'm sorry. Which news articles are we referring to?

**A. The one from the Banner dated November 2nd and also the e-mail dated September 2nd. I think both of those indirectly make indications that Assistant Sheriff Cogen at the time or Sheriff Cogen now was not happy about my promotion.**

Q. And what about the e-mail and the newsletter or -- I'm sorry; the news article indicate that Sheriff Cogen was not happy about your promotion?

**A. In an interview, the -- and I'm referencing the newspaper article from the Banner**

**promotion was the only one that had occurred already.**

Q. And so --

**A. So the contract negotiation, that piece had not taken place and the sergeant's promotions had not taken place.**

Q. Had there been a contract signed for a Smith at that time?

**A. Yes.**

Q. In the suspension notice or Exhibit 13 that you received from Therman Reed, there contains no mention of your internal EEO complaint with the Baltimore City Sheriff's Office, correct?

**A. There's no mention of the EEO complaint in the suspension paperwork. However, at that same time that I received this, I provided Assistant Sheriff Reed with a copy.**

Q. So you would agree that the exchanges -- the suspension and the settlement agreement were given at the same time, were exchanged at the same time?

**A. Yes.**
Q. In your termination letter that you received, did you -- you would agree with me that there was no mention of or, you know, mention of your EEO complaint?
**A. No.**
Q. And it's your belief that Sheriff Cogen retaliated against you based on the idea that the timing in which he came into the office and the fact that you named him in your internal EEO complaint?
**A. Repeat that question.**
Q. Absolutely. Is it your belief that Sheriff Cogen retaliated against you based on the fact that you named him in your internal EEO complaint?
**A. Yes.**
Q. And do you have a belief or does your belief rest primarily on the timing of your suspension and the date in which he was sworn in?
**A. I'm not sure what you mean by that.**
Q. Absolutely. Do you have any comments or

questions or concerns regarding the timing in which Sheriff Cogen was sworn into the Sheriff's Office and the time in which you were suspended from the Sheriff's Office?

**A. It happened within two hours. So I mean, my perception of that is that he had intentions of doing it. It happened within two hours of him being sworn in.**

Q. For you, is that two hours significant?

**A. Very significant.**

Q. And why is it significant?

**A. That's a very short period of time and I have never been suspended in my entire career with the police department nor the Sheriff's Office. And no reason was given.**

Q. Sheriff Cogen never gave you a reason as to why you were suspended?

**A. No.**

Q. Are you aware that within the first week of being sworn in, Sheriff Cogen placed five at-will employees on administrative suspension?

MR. YEARY: Objection as to relevance. You may answer.

**A. I'm not sure about that.**

Q. Okay. So to my question, you're unsure of whether Sheriff Cogen within the first week of his swearing in placed five employees on a suspension?

**A. I know he placed me on suspension. I don't know about the other people.**

Q. And are you aware that on December 27th of 2022, there were four other individuals within the Sheriff's Office who were terminated from the positions within the Sheriff's Office?

**A. I'm not sure about the number four. I heard more like eight.**

Q. And who did you hear were a part of that eight who were terminated from the Sheriff's Office on December 27th of 2022?

**A. Myself, Eness Brown, Renee Ware, another civilian lady who worked in domestic violence. Now, I believe Jason Gruzs was dismissed. I'm not sure if it was a termination.**

Q. Absolutely. So out of Ms. Brown, Ms. Ware, a civilian woman that you can't recall her name, Gruzs, and White, are you aware of any of them filing an internal EEO complaint with the Baltimore City Sheriff's Office?

**A. I'm not aware of that.**

Q. Would you agree that a newly elected sheriff is able or has the authority to select their own command level leadership?

**A. It depends. When you say select, do you mean appoint who they want?**

Q. Yes; appoint.

**A. They do have the power to appoint individuals.**

Q. And you yourself are running for the position of Baltimore City sheriff in the upcoming election; is that correct?

**A. I am.**

Q. And would you or based on your -- if you win in that position, are you going to be selecting or appointing your own command level staff?

MR. YEARY: Objection as to relevance.

**A. I would need to make an assessment of what exists within the Sheriff's Office before I make any decisions.**

Q. And in making your assessment, how much time would you need to make that assessment?

**A. I can't give you a number.**

Q. And so would you agree with me that each sheriff takes whatever time they need to make an assessment as to what they need within the Baltimore City Sheriff's Office?

**A. I can't speak for what the sheriffs have done.**

Q. But for yourself --

**A. I just know that this one fired me within two hours.**

Q. Absolutely. But for yourself, if you were to win the seat of sheriff for the Baltimore City in the upcoming election, you yourself would have taken an assessment or you would conduct an assessment of what you would need in order to either retain or

Q. Yes.

**A. That directs how those decisions are made. So in a professional capacity, that's what I would use.**

Q. And in using --

**A. To make that determination.**

Q. Absolutely. In using the disciplinary matrix and coming to a determination, a determination could involve a suspension, termination, or discipline?

**A. It could.**

Q. Ms. Tapp-Harper, can you point me to any statement made by Sheriff Cogen indicating that your EEO complaint played a role in his ultimate decision to terminate you?

MR. YEARY: Objection; asked and answered. You may answer.

**A. No.**

Q. Can you point me to any documents showing that Sheriff Cogen considered your EEO complaint when deciding to suspend and terminate you?

MR. YEARY: Same objection. You may answer.

**A. No.**

Q. Do you have any witness who has heard Sheriff Cogen say that your EEO complaint influenced his decision to suspend and terminate you?

**A. No.**

Q. Ms. Tapp-Harper, can you walk me through November 30th of 2022 and, you know, when you arrived at work and what ultimately took place on that day?

MR. YEARY: Objection as to relevance. You can answer.

**A. On November 30th, 2022, I was already at work and Therman Reed came into my office and told me I was being suspended, providing me with the suspension paperwork and told me -- you know, I asked him, I said, so I've never been suspended before, like, what is this all about? And he said, Cogen intends to fire you. So I submitted my gun and badge to him and went home.**

settlement agreement?

**A. Yes.**

Q. Then at that point, you were suspended, told to make yourself available, and then you also mentioned that there was a conversation between November 30th and December 27th of 2022 in which Therman Reed stated that at that conversation or at that point Sheriff Cogen had intended to terminate you?

**A. He told me that Cogen intended to fire me at the November 30th, 2022 conversation when the suspension happened.**

Q. Okay.

**A. I did not talk to Therman Reed again I believe until December 27th when he called me in to give me the termination paperwork, and I actually had him sign off saying, you were advised per Sheriff Samuel Cogen to conduct an exit interview for me on today December 27th, 2022 as my employment will be terminated. And Therman Reed actually signed and acknowledged that information.**

Q. Did any of those conversations include Sheriff Cogen suspending you from the Sheriff's Office?

**A. Yes.**

Q. And what was the conversation in regard to your suspension from the Sheriff's Office with Therman Reed?

**A. Therman Reed said he didn't agree with the decision.**

Q. And when did that conversation happen?

**A. I can't remember the exact date.**

Q. And outside of the conversation that you had with Therman Reed regarding him not agreeing with Sheriff Cogen's decision to suspend you from the Baltimore City Sheriff's Office, did you have any other conversations with him?

**A. Yes. He also said he didn't agree with the termination.**

Q. So outside of those conversations, are the two conversations you had with Therman Reed after December 27th of 2022 regarding his lack of

Therman Reed's decision to resign from the Sheriff's Office?

**A. Not offhand, no.**

Q. Outside of the three conversations you mentioned after December 27th of 2022 with Therman Reed, were there any other conversations that you had?

**A. I have had multiple conversations with Therman.**

Q. And did any of those conversations mention Sheriff Cogen and his reliance on an internal EEO complaint submitted by you as his reason for terminating your employment?

**A. No.**

Q. At any point in time when you were negotiating your August 17th, 2022 settlement agreement with Sheriff Anderson, did Sheriff Anderson ever mention or state to you that this settlement agreement was to be in place for a term of years?

**A. No.**

Q. Did Sheriff Anderson ever mention to you that this settlement agreement or this promotion would be protected against any sort of reversal to be made by Sheriff Cogen?

**A. We never talked about that.**

Q. So he never mentioned to you that your employment or your promotion to assistant sheriff would be protected?

**A. The law protects us so I didn't feel like I needed to talk to Sheriff Anderson about that.**

Q. So Sheriff Anderson specifically never mentioned to you that this settlement agreement that you and he had executed would be protected from any change put in place by any incoming sheriff?

**A. The agreement specifically says if I did not comply with it, it outlines how that should be addressed in the agreement. And it said that they could -- that the promotion could be rescinded or I could be demoted. It says nothing in here about even terminating me if I didn't comply with the agreement here.**

**directly a result of what had been put in place by the Sheriff's Office. And it's still there.**

Q. But you would agree with me that you never applied for any law enforcement positions post-termination on December 27th of 2022?

**A. No, I did not.**

Q. So, Ms. Tapp-Harper, we have spoken a lot about your interactions with Therman Reed in terms of his observance or recollection of interactions with Sheriff Cogen regarding your suspension, your termination, and your subsequent letter of good standing. Outside of Therman Reed, can you identify any other witness who would be able to speak to Sheriff Cogen's knowledge of your internal EEO complaint?

**A. No.**

Q. Outside of Therman Reed, are there any other witnesses who would be able to speak to Sheriff Cogen's knowledge of your requests for a letter of good standing?

**A. Possibly Joseph Whitaker, who is the chief**

**deputy.**

Q. And why do you say possibly Joseph Whitaker?

**A. Because in the command rank structure between Therman Reed, who was assistant sheriff, and Sheriff Cogen is the chief deputy, who is Joe Whitaker so it's possible that my request was funneled through him. I'm not certain, but in the chain of command, it very well could have been.**

Q. But you're not certain that it was forwarded to --

**A. No.**

Q. -- Joseph Whitaker?

**A. No.**

Q. Outside of Therman Reed or Joseph Whitaker, can you identify any witness who would be able to testify that it was or that the motivation for your suspension and your termination from the Baltimore City Sheriff's Office was based on your filing of an internal EEO complaint?

**A. No.**

page -- if you look at the page numbers on the bottom, it'll say STH 119.

**A. Okay. 11/30/22, 2022, no certification. No cert.**

Q. No cert. What do you understand no cert to be?

**A. That you're not certified.**

Q. You're not certified. Do you see any other entries after the November 30th, 2022 notation in your training record?

**A. 1/13/2023, admin criminal investigation or charges.**

Q. And what do you know that to be, if anything?

**A. As I said earlier, I really don't know because I had not been made aware of any administrative investigation or a charge. But the general definition is that this is somebody who is under investigation.**

Q. The notation there only gives you a date and a description, correct?

**A. Would I -- yes.**
Q. You become sheriff. You take office.
**A. Yes.**
Q. You have the authority to make certain decisions and you talk through some assessments.
**A. Mm-hmm.**
Q. Do you recall those answers?
**A. Yes.**
Q. Would your assuming the leadership role of the Baltimore City Sheriff's Office lead you to violate any binding agreements in place with the Sheriff's Office?
**A. No.**
Q. At any point in time since we just read the record about some discipline and investigation going on, has there ever been any conversation from Sheriff Cogen or anybody at the Baltimore City Sheriff's Office about discipline or about an investigation into your conduct while at the Sheriff's Office?
**A. No.**

Q. Anything in writing?
**A. No.**
Q. Just to be clear, the date of January 10, 2013, 2023 rather, is after your date of separation, correct?
**A. Yes.**
Q. So a notation about an investigation that's entered in January of 2023 would be after you had been suspended. Yes?
**A. Yes.**
Q. And terminated, correct?
**A. Yes.**
Q. Based on your experience with the Baltimore City Sheriff's Office, have you ever known a chief deputy on an assistant sheriff to not have law enforcement credentials?
**A. Not while I was working there.**
Q. Are you aware of any sheriff's agency in the State of Maryland or from your experience where a chief deputy or an assistant sheriff does not have law enforcement credentials?